## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Law Enforcement Officer Aaron Henrichs, being duly sworn, hereby state and depose:

1. This affidavit is submitted in support of a criminal complaint and arrest warrants against VIRGILIO ALAIN REYES CERVANTES and ERIK PIMENTAL MAGANA PLATA for a violation of Title 21 United States Code sections 846 and 841(a)(1), (b)(1)(A)(vii) (conspiracy to manufacture, to distribute, and to possess with intent to distribute more than 1000 marijuana plants).

## INTRODUCTION AND OFFICER BACKGROUND

2. I am a Law Enforcement Officer (LEO) with the United States Forest Service (USFS), assigned to the Rocky Mountain Region, specifically to the San Isabel National Forest and the Cimarron and Comanche Grasslands, and have been so assigned since January 2016. I have been employed with the USFS as a Law Enforcement Officer since December 2011. Prior to this I was a Patrol Agent for the U.S. Border Patrol in Washington and Arizona, a Game Warden in Kansas, and a Police Officer in Lincoln, Nebraska beginning in 1999. I am a graduate of the Federal Law Enforcement Training Center--from the Land Management Police Training (LMPT) in 2012, and from the Border Patrol Officer Basic in 2009. I am also a graduate of the Kansas Law Enforcement Training Center in 2002 and the Lincoln Police Academy in 1999. I completed my undergraduate degree in Natural Resources from the University of Nebraska, in Lincoln, Nebraska. My primary duties as a Law Enforcement Officer include detecting, investigating, apprehending, and prosecuting criminal activity on and relating to National Forest System lands. I have been both the lead and assisting investigator in numerous controlled substance investigations and have arrested/cited dozens of persons for possession, manufacturing, transportation, and sales of various controlled substances and illegal drug paraphernalia. While employed as an LEO, I have been directly involved with the investigation of approximately a dozen large-scale outdoor marijuana grow sites on federal, state and private lands and have been directly involved with the detection and eradication of thousands of marijuana plants. The grow sites have been in various stages of production. As a result of investigating these grow sites, I have become very familiar with methods used by the growers to locate, set up, cultivate, harvest, and conceal the marijuana grow sites. I have also become very familiar with methods used to re-supply the grow sites and remove harvested marijuana from the mountains. As a result of these investigations, I have learned that the primary means of communication between the growers and the upper levels of their organization is by cellular telephone. During the course of these investigations, I have had the opportunity to observe subject interviews involved in the cultivation and transportation of marijuana. During these conversations, I have learned of methods used to grow marijuana, evade detection, and communicate with upper levels of their organization, and transport marijuana and supplies on USFS lands. I have also observed subjects dropping off supplies and personnel to grow sites and have observed processed marijuana being removed by vehicle from the grow site areas. I have spotted marijuana grow sites by air. I have over 15 years of on-the-job training and experience in tracking people through mountains and deserts in a variety of conditions and situations. I have used these skills in following drug smugglers on the International Border and to detect and track marijuana growers on numerous occasions. I have received over 100 hours of formal training

relating to the enforcement of controlled substance laws. This training has been provided to me by other officers, on the job and in the classroom. I have worked with numerous outside agencies at the local, county, state, national, and international level. I am also responsible for investigating other crimes that occur on or have a nexus to USFS lands including, but not limited to, fire, recreation, timber, internal affairs, wildlife, resource and property damage, and theft. I have authored state and federal search and arrest warrants and have participated in the execution of federal and state search warrants related to those activities.

3. During my career, I have participated in controlled substance investigations, including conspiracies to manufacture, distribute, and possess with intent to distribute controlled substances (21 U.S.C. Sections 841(a)(1) and 846) and the manufacture, distribution, and possession of controlled substances with the intent to distribute (21 U.S.C. Section 841 (a)(1)). These investigations targeted drug trafficking organizations primarily engaged in the sale, manufacture, importation, and/or distribution of marijuana, which in some instances, also involved cocaine, methamphetamine and other controlled substances. During the course of my work, I have had the opportunity to converse with numerous Law Enforcement Officers, drug enforcement officers, as well as admitted and known drug traffickers as to the methods regarding the manufacture, importation, transportation, distribution and sales of controlled substances. I have testified in state courts in the area of illegal narcotics.

4. Through prior investigations and training, I have become familiar with the types and amounts of profits made by drug dealers and the methods, language, and terms that are used. I am familiar and have participated in various investigative methods, including, but not limited to, visual and audio surveillance, interviewing of witnesses, plain clothes operations, search warrants, and use of confidential informants. I have worked joint investigations with other experienced Officers, Special Agents, Detectives and Investigators, who are trained in narcotics investigations, and I have drawn from their knowledge and expertise in the field of narcotics enforcement.

5. Typically, drug traffickers possess firearms and other dangerous weapons in order to protect their profits, supply of drugs and associates, from others who might attempt to forcibly take them from the trafficker.

6. I know that marijuana traffickers often cultivate marijuana on or near public lands throughout the country, including the USFS Rocky Mountain Region within the 10th Circuit.

7. Based on my training, experience, and discussions with other experienced narcotic agents, I know that firearms and other evidence seized from the marijuana cultivation site and discussed herein have also been recovered from structures found on other clandestine marijuana cultivation sites, as well as residences searched as a result of information gathered from evidence found in the clandestine marijuana grow sites.

8. Based on my training and experience, through discussions with experienced narcotics investigators and through the information I have learned through investigations, I know that most outdoor live-in marijuana cultivation operations are generally conducted in a similar manner. Outdoor marijuana cultivation operations involving a large number of marijuana plants require

substantial labor to tend to the plants, provide logistical support for the labor force tending to the plants, and provide financial support until proceeds for the processed marijuana are received.

9. Outdoor marijuana cultivation organizations generally start exploring and scouting potential cultivation sites in the late winter and early spring. These organizations are normally in search of areas in which the snow melts comparatively early, in close proximity to a viable water supply, and isolated to avoid encounters with hikers, hunters and law enforcement. Most outdoor marijuana cultivation organizations desire to plant marijuana plants as early as possible in order to harvest the plants as early as possible and potentially plant a second crop for the year before it becomes too cold in the late fall and early winter. Additionally, during scouting excursions, these organizations attempt to identify drop points that can be utilized for the delivery of supplies, equipment and people, which are in adjacent proximity to the operation's trail heads and/or cultivation sites. A drop point is a designated location where the drivers can deliver equipment, supplies, and workers for the cultivations site(s). Drop points are normally located along a rural route so that the cultivation workers can walk the delivered supplies to the camp area and the marijuana from the grow site to the drop point undetected. It is normal to locate a distinct trail system near the drop points.

10. Once an outdoor marijuana cultivation organization identifies possible cultivation sites, the organization engages in procuring needed supplies to prepare the land and locate and set up a water source for the cultivation site. In many cases, fertilizers, herbicides, pesticides and irrigation equipment are acquired from various vendors, as well as through illegal sources, such as through smuggled items brought into the United States.

11. As equipment and supplies for the marijuana grow site are procured, the outdoor marijuana cultivation organization starts to deliver items to the area of the marijuana cultivation site. Usually, these items are delivered to the pre-designated drop points.

12. The land is prepared for planting and watering of the marijuana plants. Once a natural water source is identified and diverted, a water reservoir may be established, and an irrigation system is usually constructed. The natural vegetation is cut, removed, or thinned to make space and allow for sunlight for the marijuana plants. Locations for the live-in camp(s) are also established and can be located anywhere from within the cultivation site up to one half mile away. Workers in the grow site often live in tents, lean-tos, or make-shift living areas, sometimes enclosed, within or near the cultivation site or along the trails leading to them.

13. After the land has been prepared for planting, the marijuana seeds or plants are placed into the ground. For cultivation sites that use live-in workers, camps are prepared and the live-in workers establish unauthorized occupancy in the cultivation areas.

14. Throughout the growing season, which lasts between three and six months, various supplies, equipment and groceries, are purchased by the supply purchasers. As required items are obtained or designated, deliveries are made to the designated drop point. Deliveries have also included prostitutes and additional workers.

15. As the marijuana plants mature, more workers arrive at the cultivation site(s) to help with the labor involved in harvesting and processing of the marijuana. The harvested marijuana is laid out or hung to dry in processing areas within the cultivation site(s) and, as it becomes dried, is packaged and moved to the drop point for pick up by the drivers who deliver it to packaging or distribution centers or to the organization's leadership.

16. Outdoor marijuana cultivation organizations are most often dependent on the use of cellular telephones to facilitate communications in furtherance of the cultivation of marijuana. Cellular telephones are used to communicate among co-conspirators, distributors, purchasers, drivers, the laborers in the grow site(s), and their leaders. Communications include coordinating the procurement of supplies and equipment and oversight of the progress of the tended marijuana plants. Some cultivation sites are located in areas where there is no cellular phone service. In these situations, a designated check-in time is established, in which the growers walk to an area where there is cellular service to place their cellular telephone calls.

17. Upon completion of harvesting the marijuana plants, the sites are abandoned, leaving behind materials such as illegal pesticides, herbicides, fertilizers, trash, propane tanks, and food items. The items left behind often attract wildlife, such as bears, which attempt to eat the discarded items and have been killed by ingesting such items. These by-products of marijuana cultivation harm the environment and wildlife and contaminate nearby water sources, such as creeks and streams.

18. Based on my training and experience, I know that once the processed marijuana is removed from the mountains it is often taken to a location commonly known as a "stash house," where it is then weighed, packaged, and stored, until it can be distributed and sold. Based on my training and experience, I know that many times these stash houses are on rural properties, including ranches and agricultural properties, where it is easier for the suspects to keep their activities hidden from neighbors. Sometimes it is taken to marijuana dispensaries and sold as legally grown marijuana.

19. Based on my training and experience, I know that it is generally a common practice for people who traffic in large amounts of controlled substances to keep records, proceeds from drug transactions, and other evidence. I know that records, in particular, are often maintained by drug traffickers. These records include pay-owe sheets or notations. Evidence of such records are typically maintained and found within camps, upon the premises owned or controlled by the drug trafficker, upon their persons, or within vehicles they use, and are of evidentiary value.

20. Based on my training and experience, I know that persons who grow and distribute marijuana use miscellaneous written documents such as published books and magazines concerning marijuana manufacturing and sales, written records concerning the perpetrator's cultivation of marijuana, account ledgers dealing with profits and losses associated with growing and distributing marijuana, growing schedules, documents concerning profitability, and other such documents and written records. These written records and documents are normally discovered during the execution of a search warrant upon the camp, the premises owned or controlled by the marijuana grower, upon their persons, or within vehicles they use, and are of evidentiary value. I also know that marijuana traffickers oftentimes use wire transfers, cashier's

checks, and money orders to pay for controlled substances or transfer proceeds. Evidence of such financial transactions and records relating to income and expenditures in connection with drug trafficking are typically maintained and found upon the premises owned or controlled by the marijuana grower, upon their persons, or within vehicles they use, and are of evidentiary value. During investigations of marijuana cultivation grow sites in the mountains, I have found written documents, including, but not limited to, pay-owe sheets, lists of phone numbers (including numbers of potential co-conspirators), records of marijuana harvested, calendars indicating watering schedules, duration of time in the grow site and supply deliveries, lists of associates (including names of potential co-conspirators), and identification documents such as driver's licenses, state identification cards, credit cards, school identification, social security cards, and voter registration cards.

21. Based on my training and experience, I know drug traffickers typically possess firearms and other dangerous weapons to protect their profits, supply of drugs, and persons from others who might want to forcibly take the traffickers' profits and/or supply of drugs.

22. Based on my training and experience, I know that drug traffickers seeking to avoid detection of their illegal narcotics, weapons, and/or large amounts of currency, frequently hide these items in their enclosed tents in camp as well as in residences, garages, storage buildings, unused recreational vehicles, travel trailers, or other unused vehicles parked on their property or at their residences and in, under, or behind camping equipment, yard furniture, buildings, plants, trees, rocks, trash containers, and other items located within or near their residences.

23. My awareness of these drug trafficking practices, as well as my knowledge of drug manufacturing and distribution techniques as set forth in this Affidavit, arise from the following:
    (a) my training in controlled substance investigations;
    (b) my past experience in the investigation of outdoor marijuana cultivation operations;
    (c) the experience of other drug officers and agents who have trained and advised me; and
    (d) other information provided through law enforcement channels such as databases.

## NATURE OF AFFIDAVIT

24. Both individuals were detained on October 6, 2017, while attempting to flee from a marijuana grow site (named "Ophir Creek") on federal lands, located at or near the following location in the Ophir Creek watershed, Colorado. The site consisted of multiple areas connected by well-worn foot paths. There were multiple areas where suspected marijuana plants were harvested or still growing, multiple drying areas where suspected marijuana plants were hanging to dry, a kitchen area well supplied with food and beverage, and a sleeping area with multiple sleeping bags, and clothes. The grow site is on Forest Service lands, approximately 4 miles North of San Isabel, CO, 1 mile west of mile marker 13 on Hwy. 165, in an unnamed small drainage of the Ophir Creek system, on a generally east aspect.
Approximate GPS coordinates for "Ophir Creek": N 38 ° 02 '45.5" by W -105° 06' 35.7".

25. The facts set forth in this affidavit are based on my direct participation in the investigation, observations of other officers named herein, training and experience and information obtained

from other witnesses and LEOs, including their incident reports. I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary and applicable to establish a sufficient foundation of probable cause for the issuance of a complaint and arrest warrants. I have not purposely omitted any fact(s) that undermine or are contrary to the opinions and conclusions set forth herein.

## STATEMENT OF PROBABLE CAUSE

26. While hiking in an area of historical marijuana garden locations on September 25, 2017, I, U.S. Forest Service Law Enforcement Officer Aaron Henrichs was checking a feeder creek off of Ophir Creek. While descending the slope into the drainage I saw an area of dark green plants in the bottom of the drainage below my position. Using binoculars I was able to identify the plants as suspected marijuana. Upon looking around the area further I was able to see a wall of cut brush surrounding the plants on the upper slope, a green container that appeared to be Miracle Grow brand fertilizer, and a blue piece of tarp. I exited the area as a heavy fog moving down the drainage made further observations impracticable.

27. On September 29, 2017, I returned to the drainage to further check the area for trails and other growing locations. Farther south in the drainage I located dozens of leafy green suspected marijuana plants. I did not see any structures or hear any evidence of occupancy. I scouted the areas for trails and could not locate any from the west side. It appeared access may be gained from private land off of Hwy 165, just south of Bishops Castle.

28. On the morning of October 6, 2017, several agents from multiple agencies briefed at the Lake Isabel Work Center near San Isabel, CO. After hiking into the general area of the grow site we divided into two groups in order to hike into the grow site from two directions.

29. Agents converged on the lower (northern) Ophir Creek grow site and discovered living marijuana plants in multiple plots, and evidence that many of the marijuana plants had already been trimmed and were drying under a drying structure. Specifically, it appeared that more than 3,000 plants, planted in rows, were still standing and approximately 100 pounds of processed suspected marijuana had already been harvested and was drying under tarps. A representative sample of the plants was collected as evidence.

30. Near the lower drying structure agents located a Remington Mohawk 48 shotgun loaded with 4 rounds of Hornaday 00 Buck ammunition. A records check of the gun indicated that it was stolen out of El Paso County, CO. The drying area also contained a notebook, a digital scale, a two way radio, and .22 caliber rifle ammunition.

31. Within approximately 50 yards from the lower drying area of the grow location, in the middle of the lower and upper areas, a kitchen and sleeping area was located. The kitchen, well supplied with food, was constructed of cut pine timber. Adjacent from the kitchen rear wall was a sleeping area. This sleeping area held multiple sleeping bags, clothes, two pellet guns, a two way radio, a .22 caliber Marlin rifle, and 12 gauge shotgun ammunition. The kitchen/sleeping area was connected to the lower drying area by a well-worn foot path. Another well-worn foot path was followed to an upper site.

32. Upon first entering the upper Ophir Creek site on October 6, 2017, agents observed plants in rows, black irrigation hose, and a man-made drying structure. As agents converged on the processing area they observed multiple individuals under and next to a tarp structure covering drying suspected marijuana. At some point, some of the individuals walked away from the structure and out into the rows of plants. As I approached the processing area, one subject sat on the ground with a pair of scissors trimming leaves from suspected marijuana plants and another was drinking water from a black irrigation hose.  The individual drinking from the hose saw me and immediately ran away. I immediately announced "Police" and "stop." The seated subject put his hands up and sat still while the other subject was apprehended by other agents after a brief foot pursuit.  The two Hispanic males (later identified as VIRGILIO ALAIN REYES CERVANTES and ERIK PIMENTAL MAGANA PLATA) were all checked for weapons, identification, and injuries. None were found.

33. Agents located and collected approximately 65 pounds of processed suspected marijuana drying in the upper drying structure.  Agents also found a notebook, cellular telephones, food, empty tequila bottles, and a propane stove in the structure.  It appeared that more than 5,000 living suspected marijuana plants were planted in rows near and surrounding the structure.  A representative sample of the plants was collected as evidence.

34. Agents observed what appeared to be over-the-counter insecticide, rodenticide, and fertilizer exposed in the grow site area.  Numerous trees at the site had been delimbed and a significant amount of brush cleared to allow more sunlight to the plants.  A reservoir was discovered with multiple black irrigation hoses leading to the plants and to the kitchen area.  Approximately seven acres of federal lands were effected.  Pursuant to eradication operations, the agents eradicated a total of approximately 8,930 plants and documented this process.

35. VIRGILIO ALAIN REYES made several statements as I detained him and searched him for weapons.  He was crying as he stated that he had been in here for ten days, had worked in a kitchen before, but left because this money was so good.  I looked at his hands and noticed that there appeared to be a sap-like substance on them consistent with Tetrahydrocannabinol (THC) derived from marijuana plants and is often found on the hands and clothes of those who work with marijuana. After being read his *Miranda* rights he did not waive his right and was not interviewed. He was taken into custody and transported out of the grow site.

36. ERIK PIMENTAL MAGANA PLATA had an odor of alcoholic beverage about his person and appeared intoxicated when he was detained.  I looked at his hands and noticed that there appeared to be a sap-like substance on them consistent with Tetrahydrocannabinol (THC) derived from marijuana plants and is often found on the hands and clothes of those who work with marijuana. After being read his *Miranda* rights he did not waive his right and was not interviewed.  He was taken into custody and transported out of the grow site. As he left the grow site he said to take care of the plants.

## CONCLUSION

37. Based on the foregoing facts and information, there is probable cause to believe that VIRGILIO ALAIN REYES CERVANTES and ERIK PIMENTAL MAGANA PLATA violated

Title 21 United States Code sections 846 and 841(a)(1), (b)(1)(A)(vii) (conspiracy to manufacture, to distribute, and to possess with intent to distribute more than 1000 marijuana plants).

I swear under penalty of perjury that the facts presented are true and accurate to the best of my knowledge.

      Respectfully submitted this 10th day of October, 2017.

                        *s/Aaron Henrichs*
                        AARON HENRICHS
                        Law Enforcement Officer
                        United States Forest Service

Submitted, attested to, and acknowledged by reliable electronic means on October 10, 2017.

                        BY THE COURT:

                        HON. SCOTT T. VARHOLAK
                        UNITED STATES MAGISTRATE JUDGE
                        DISTRICT OF COLORADO

**This Application and Affidavit was reviewed and submitted by AUSA Emily May.**